The FARMERS NATIONAL BANK OF ANNAPOLIS et al.

v.

William B. CAMP, Comptroller of the Currency of the United States.

Civ. No. 71–70.

United States District Court,
D. Maryland.

Sept. 21, 1971.

Baltimore, Md., and Ernest N. Cory, Jr., Laurel, Md. (R. Tilghman Brice, III, and William E. Kirk, Annapolis, Md., on brief), for plaintiffs.

George Beall, U. S. Atty., and J. Frederick Motz, Asst. U. S. Atty., Baltimore, Md., and John E. Shockey and Dorothy S. Kulig, Attys., Office of the Comptroller, Washington, D. C. (L. Patrick Gray, III, Asst. Atty. Gen., Dept. of Justice, and Harland F. Leathers and David Epstein, Attys., Dept. of Justice, Washington, D. C., on brief), for defendant.

THOMSEN, District Judge.

On May 11, 1970, Chesapeake National Bank, of Towson, Baltimore County, Maryland, applied to the Comptroller of the Currency for permission to establish a branch bank at 209 Main Street, Annapolis, Anne Arundel County, Maryland. A detailed summary of economic and financial information was submitted by Chesapeake in support of its application.

Competing banks in the area and the Maryland State Bank Commissioner were notified of the application and invited to submit their view to the Regional Administrator of National Banks for the Fifth National Bank Region in Richmond, Virginia. The Deputy State Bank Commissioner noted that the proposed branch would be located near the main office of the Annapolis Banking & Trust Co., but did not offer any additional comment on the application. Farmers National Bank and Annapolis Banking & Trust Co. objected to the branch and requested a hearing. A protest was also lodged by Colonial Bank & Trust Co., of Parole, a suburb of Annapolis. No objections were filed by other banks in the area.

The requested hearing was held in Richmond on August 13, 1970, before a panel consisting of the Regional Administrator, the Regional Economist and a staff attorney. Prior to the hearing each protestant was furnished with a copy of the written procedures by which the hearing would be conducted and each had access to the Comptroller's public

Donald N. Rothman, Robert E. Sharkey and Gordon, Feinblatt & Rothman,

file. The protestants asked that they be given access to the materials deleted from the public file, and filed suit in this Court to compel such access. The Deputy Comptroller thereupon ordered that all of the deleted information, except the opinions, conclusions and recommendations contained in the report of the investigating examiner, be included in the public file. The plaintiffs then dismissed their suit, stating: "The Defendant's having furnished all of the information that the Plaintiff was seeking except the examiner's conclusions, and the Plaintiffs being satisfied that the defendant cannot be called upon to furnish these conclusions, it is respectfully requested that the case be marked 'dismissed'."

At the panel hearing the three protestants appeared, offered testimony, and filed documentary evidence. The applicant rested on its written application and supporting information, although both its president and chairman were present. The Regional Administrator attempted to question the applicant's president pursuant to Rule 16(b) of the hearing procedures for the Fifth National Bank Region (which permits questioning of any person present by the hearing panel and subsequent cross-examination by other parties on those matters on which he has been questioned), but counsel for the protestants objected, stating that they did not want the applicant's president called "either now or hereafter".

A field investigation of the application was made by a national bank examiner, and the record was reviewed by the Regional Administrator, the Regional Economist and members of the Comptroller's Senior Staff. All but one of them recommended approval, and the Comptroller approved the application on October 7, 1970, without a written opinion or other statement discussing the issues.

The three protestants then filed this action, attacking the decision on substantive and procedural grounds.

On March 1, 1971, the Comptroller moved that the case be remanded to him, so that he might set forth the reasons for his approval of the application. After a hearing, the motion was granted, on conditions, and on May 28, 1971, the Comptroller issued a formal opinion, stating his reasons for approving the application, which was filed with this Court, together with the administrative record. Thereafter hearings were held on plaintiffs' (protestants') motion for *de novo* review and on the Comptroller's motion for summary judgment.

### De Novo Review

Plaintiffs state the grounds of their motion for *de novo* review as follows:

"1. That the Comptroller did not afford the Plaintiffs an opportunity to know, and effectively rebut, essential adjudicative facts which he considered and upon which he, in whole or in part, based his action.

"2. That the Plaintiffs were not afforded the opportunity to effectively rebut or refute essential adjudicative facts submitted by the applicant bank for his consideration, and upon which facts he, in whole or in part, based his action, because the applicant was not required to, and it did not voluntarily, submit to cross-examination by Plaintiffs on these facts.

"3. Since the action of the Comptroller in approving the said application was adjudicatory in nature, his failure to afford Plaintiff a fair hearing on essential adjudicative facts consonant with the requirements of due process subjects his action to *de novo* review in this Court."

The Fourth Circuit has held that the Comptroller is not required to hold a hearing on an application, but unless he does hold an adversary hearing, a protestant is entitled to a determination *de novo* in court; a protestant is not entitled to a determination *de novo* except where the Comptroller failed to conduct an adversary hearing. First National Bank of Smithfield v. Saxon, 352 F.2d

·267 (4 Cir. 1965); First-Citizens Bank and Trust Co. v. Camp, 409 F.2d 1086 (4 Cir. 1969).

In *First-Citizens* the Fourth Circuit also held that in considering an application for a branch bank the Comptroller is not bound to the requirements of § 7 of the Administrative Procedure Act, 60 Stat. 241, now codified as 5 U.S.C. § 556, which specifies procedures for hearings required by what is now 5 U. S.C. 553 and 554 (Rule Making and Adjudications, respectively). 409 F.2d at 1089. A panel which conducts such a hearing as was held in this case "is simply an investigatory or fact-gathering organ, not having any fact-finding function." 409 F.2d at 1090.[1] However, "even in a fact-gathering procedure, due regard should be had for a party to know and meet opposing evidence with explanation or rebuttal evidence. 1 Davis, Administrative Law Treatise, § 4.04 (1958 Ed. and 1965 Supp.); § 7.16, at p. 180 (1965 Supp.)." 409 F.2d 1090.

■ The action of the Comptroller in either granting or denying approval of the establishment of a branch is reviewable under § 706 of the APA, 5 U.S.C. § 706. In *Smithfield*, the Fourth Circuit said:

"Abundant authority, with which we agree, holds that the Comptroller's determination in the present area is not immunized from review by the exemption in the preface of § 1009, APA, reading, 'Except so far as * * * agency action is by law committed to agency discretion.' Any discretion vested in the Comptroller in passing upon applications for approval of bank branches is not the type of discretion to which action has been 'committed by law' but is rather one of the character expressly made reviewable by § 1009(e) (1). * * *" 352 F.2d at 270.

See also *First-Citizens*, supra, and Pitts v. Camp, 321 F.Supp. 407 (D.S.C. 1970).

The section of the APA referred to in the passage from *Smithfield*, quoted above, § 1009, APA, is now codified as 5 U.S.C. § 706, pursuant to P.L. 89–554, 80 Stat. 378, approved September 6, 1966. It provides in pertinent part as follows:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

" * * *

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

" * * *

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule, of prejudicial error."

In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Court said:

" * * * *De novo* review of whether the Secretary's decision was 'unwarranted by the facts' is authorized by § 706(2) (F) in only two circumstances. First, such *de novo* review is authorized when the action is adjudicatory in nature and the agency

---

1. The stated purpose of the hearing in the instant case was:
"This hearing will be used both as a vehicle to allow the expression of any

views, both in favor of and against the application and also as an investigative device by this office."

fact finding procedures are inadequate. And, there may be independent judicial fact finding when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action. * * *"

The question whether the action of the Comptroller in such a case as this is or is not "adjudicatory", as that term is used in *Overton Park*, is not without difficulty. See 1 Davis, Administrative Law, § 7.02 and § 7.03 (1958 ed.); Ibid (1965 pocket supp.), §§ 7.02, 7.03 and 7.-10; Ibid (1970 supp. vol.) § 7.03.[2] In *Smithfield*, the Fourth Circuit found it unnecessary to decide the question, which was raised in a different context; the Court avoided the point by assuming, *arguendo*, that the Comptroller's action was adjudicatory. 352 F.2d 270.

· In *First-Citizens*, as we have seen, the Fourth Circuit held that in considering an application for a branch bank the Comptroller is not bound by the requirements of what is now 5 U.S.C. § 556, and therefore must have concluded that the proceeding is not an "adjudication required by statute to be determined on the record", within the meaning of what is now § 554. The principal discussion in *First-Citizens* was whether the hearing was "adversary".

Whether or not the proceedings before the Comptroller were adjudicatory, as that word is used in *Overton Park* that would not settle the question of plaintiffs' right to *de novo* review, because this Court concludes, for the reasons set out below, that plaintiffs have failed to satisfy the other half of the first *Overton Park* ground for *de novo* review— they have failed to show that the agency fact finding procedures were inadequate under all the circumstances of this case.[3] This Court further concludes that protestants did have an "adversary" hearing, as that term has been used by the Fourth Circuit.

The Courts have recognized that in proceedings before the Comptroller various interests are involved: the interests of the applicant bank, of the public, of the protesting banks, and of the other banks in the area which do not protest, but whose business secrets are entitled to protection.[4] It is impractical to conduct such a proceeding in the same manner as a civil action in the courts. Due process embodies the differing rules of fair play which have become associated

2. Especially noteworthy are the comments in 1 Davis, Administrative Law, § 7.02 (1958 ed.) :

"Facts pertaining to the parties and their businesses and activities, that is, adjudicative facts, are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavorable to them, that is, without providing the parties an opportunity for trial. The reason is that the parties know more about the facts concerning themselves and their activities than anyone else is likely to know, and the parties are therefore in an especially good position to rebut or explain evidence that bears upon adjudicative facts. Yet people who are not necessarily parties, frequently the agencies and their staffs, may often be the masters of legislative facts. Because the parties may often have little or nothing to contribute to the development of legislative facts, the method of trial often is not required for the determination of disputed issues about legislative facts."

3. The second ground for *de novo* review recognized by *Overton Park* is not applicable, because this is not a proceeding to enforce agency action.

4. First National Bank of Smithfield v. Saxon, 352 F.2d 267 (4 Cir. 1965); First-Citizens Bank and Trust Co. v. Camp, 409 F.2d 1086 (4 Cir. 1969); Ramapo Bank v. Camp, 425 F.2d 333 (3 Cir.), cert. denied 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970); Sterling National Bank of Davie v. Camp, 431 F.2d 514 (5 Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971); and see by way of analogy Bridgeport Federal S & L Ass'n v. Federal Home Loan Bank Board, 307 F.2d 580 (3 Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499; Northwest Bancorporation v. Board of Governors, 303 F.2d 832–844 (8 Cir. 1962); First National Bank of McKeesport v. First Federal S & L Ass'n, 96 U.S.App.D.C. 194, 225 F.2d 33 (1955); Fahey v. O'Melveny and Myers, 200 F.2d 420 (9 Cir. 1952), cert. denied, Mallonee v.

with and are appropriate to differing types of procedures. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).[5]

In this case the protestants were given access to the entire public file, which included everything before the Comptroller except the opinions of his subordinates. They availed themselves of the opportunity given them to meet that evidence with testimony and exhibits of their own. They complain that they were not allowed to cross-examine the officers of the applicant. The principal officers of the applicant were present at the hearing; they were not called as witnesses by applicant's counsel,[6] but when the presiding officer undertook to call one of them, protestants' counsel objected. The rules adopted by the Comptroller limit cross examination by protesting parties or the applicant to matters on which the witness has answered questions directed to him by the panel, but plaintiffs have failed to show that they would have been denied the right of adequate cross-examination with respect to any material evidence offered by the applicant.

This Court called upon counsel for plaintiffs to state the points on which they feel they were prejudiced by the manner in which the proceedings were conducted. They listed three:

(1) That applicant's evidence with respect to profitability of the proposed branch was based upon a larger service area than the service area suggested by protestants and adopted by the Comptroller. In response to the Court's suggestion that both sides comment on each of those points, the Comptroller filed a supplemental memorandum herein on July 15, 1971, which shows that he adopted protestants' views with respect to the service area, and that he made his determinations of need, convenience and the other questions involved, with that area in mind, although he admittedly considered evidence presented with respect to both areas. Protestants had the opportunity to present their evidence with respect to both areas and to argue their points fully.

(2) That applicant had referred to a "survey" which purported to show that many people were dissatisfied with banks in the Annapolis area and supported the entry of applicant into the market. It developed that there was no formal survey, and that the statement was based upon comments by anonymous people to various representatives of the bank. It stands to reason that some people in the Annapolis area wanted the special services which applicant intends to supply and which were referred to in the Comptroller's opinion. It does not appear that protestants sought at the hearing to obtain further information about the so-called survey. Moreover, although the Comptroller considered the entire record, the "survey" is not mentioned in any of the opinions, conclusions or recommendations of the members of the Comptroller's staff who reviewed the application; nor is it mentioned in the Comptroller's opinion.

(3) That the investigating examiner stated in his report of investigation that two of the existing national bank offices in Annapolis have "minimal criticized paper", as tending to show the conservative character of the existing banks in the Annapolis area. One of the two national banks referred to was a protestant; the other was not. Plaintiffs do not challenge the truth of the statement with respect to the protesting national bank, and the policy regarding

---

Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374 (1953).

5. See also cases cited in Chafin v. Pratt, 358 F.2d 349 (5 Cir. 1966), cert. denied, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105; Studemeyer v. Macy, 116 U.S.App. D.C. 120, 321 F.2d 386 (1963), cert. denied, 382 U.S. 834, 86 S.Ct. 78, 15 L.Ed.

2d 77; Wes Chapter, Flight Eng. Int. Ass'n v. National Mediation Board, 114 U.S.App.D.C. 229, 314 F.2d 234 (1962), as well as First-Citizens Bank and Trust Co. v. Camp, supra.

6. Who submitted his case on the application, to which 18 U.S.C. § 1001 applies.

**628**

confidentiality of reports[7] prevents inquiry into the policies of the non-protesting national bank. The Comptroller was entitled to consider his knowledge of the conservative character of the existing banks in his determination of whether the public advantage would be served by the approval of an additional banking office.

■ The Court concludes that plaintiffs were not prejudiced by the denial of any procedural right, and that they had a fair opportunity to know and meet the evidence offered by the applicant. Their motion for a trial *de novo* should be denied.

### The Comptroller's Motion for Summary Judgment

The applicable federal statute, 12 U.S.C. § 36(c) (2), allows the establishment of branches of national banks

"at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * * "

The Maryland statute, Art. 11, § 65, Md.Ann.Code, contains no objective restriction as to location, but provides that the approval of the Bank Commissioner

"shall not be given until he shall have ascertained to his satisfaction that the public convenience and advan-

tage will be promoted by the opening of any such branch or branches, * * * * "

■ "The Comptroller is bound by this provision of the Maryland law when he considers an application for the establishment of a proposed new branch of a national bank in Maryland. First National Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); First-Citizens Bank and Trust Co. v. Camp, 409 F.2d 1086, 1091 (4 Cir. 1969)." Citizens National Bank v. Camp, 317 F. Supp. 1389, 1392 (D.Md.1970).

■ The words "public convenience and advantage", as used in the Maryland statute, mean something more than the convenience and advantage of the applicant bank and its existing customers at some other branch. Weer v. Page, 155 Md. 86, 93, 141 A. 518 (1928); 29 Op. Atty.Gen. of Md. 59 (1944).[8] See also Pub. Serv. Comm. v. Philadelphia B. & W. R. R. Co., 155 Md. 104, 122, 123, 141 A. 509 (1928); *Citizens,* supra, 317 F.Supp. at 1393.

The Comptroller stated in a memorandum filed herein that he has "serious reservations as to the wisdom in general of attempting to bind his discretion on branch applications by references to subjective non-location restrictions in state statutes," even though the Fourth Circuit, in *First-Citizens,* specifically rejected the argument that the Comptroller "is bound only by state capitalization and state location requirements", 409 F. 2d at 1091. However, the Comptroller further stated that his "reservations did

7. See 12 U.S.C. § 481; 5 U.S.C. § 552(b) (8); and Bank of America Nat. Trust & Sav. Ass'n v. Douglas, 70 App.D.C. 221, 105 F.2d 100 (1939).

8. The Attorney General of Maryland, interpreting Art. 11, § 65 of the Code, said: "[T]he public convenience and advantage mentioned in the statute concerns the entire public and not customers of any one bank. Every bank in Baltimore City might be able to show that it would be convenient for their respective cus-

tomers to have branches throughout the outlying districts of the City, and even to have branches located at numerous convenient places in the business district, but it will hardly be contended that such multiplication of branches would promote the public convenience and advantage. See Dorman v. City Council of Lewiston, 17 A. 316, 318, 81 Me. 411, in which it was held that 'public convenience' meant that common to all citizens of the City." 29 Op.Atty.Gen. of Md. 59, at 60.

not create a problem in passing upon the Chesapeake National application" since "there does not appear to be any substantive difference between the 'public convenience and advantage' factor in the Maryland statute and factors always considered by the Comptroller", which are set out in a publication entitled "Comptroller's Policy Guidelines for National Bank Directors." This Court agrees that the federal criteria bear on the question of "public convenience and advantage" and, taken as a whole, amount to substantially that test.

Plaintiffs agree that the criteria set out in the Guidelines are substantially in accord with the Maryland statutory criteria. In the Supplemental Instructions contained therein, it is stated that "convenience means * * * the convenience to the community to be served by the addition of this branch office" and is premised on an analysis of "service areas and the locations of existing branch offices, both of the applicant and of the other commercial banks". Need means "viewed from the community's standpoint, what banking needs exist in the community that are not now being served or are being inadequately served by existing banking offices".

The original decision of the Comptroller approving the application was not accompanied by any opinion or other statement of his views. The record did contain the recommendations and reasons therefor given by some of his staff. Although the Comptroller is not required to write an opinion or otherwise state his reasons, a failure to do so may cause various problems. See *Citizens*, supra, 317 F.Supp. at 1392–1394, and the authorities discussed therein.

Several months after the instant suit was filed, the case was remanded to the Comptroller, at his request, so that he might set forth the reasons for his approval of the application. He did so in a nine-page opinion filed with the Court. The opinion is, to some extent at least, a "post hoc rationalization," and should be reviewed critically. *Overton Park*, supra, 401 U.S. at 409, 91 S.Ct. 814.

The opinion discusses the points at issue and sets out at length the facts upon which the Comptroller relies. It does not set out the evidence offered by protestants, and may fairly be criticized for not making clear whether some of the facts stated apply to the smaller service area found appropriate as well as to the larger service area which was the basis of some of the evidence. This matter was clarified by the supplemental memorandum filed herein by the Comptroller, referred to above under the heading "*De Novo* Review".

Although the Comptroller did not make a specific finding or conclusion framed in the language of the Maryland statute, that is not necessary. The recommendations of his staff before the original decision, and the opinion of the Comptroller after remand show clearly that the factors required to be found by the Maryland statute and by the Comptroller's own Policy Guidelines were in his mind when he made his decision.

Plaintiffs also claim that the Comptroller's conclusions with respect to need and convenience are based upon inadequate evidence and are indeed contrary to the evidence. It is true that the facts relied on by the Comptroller to support his conclusions with respect to need and convenience are meager, and this Court might well have decided those points differently; but the decision was one for the Comptroller to make and not the Court.[9]

The scope of review in such a case as this has been frequently discussed, quite fully in *First-Citizens*, supra, 409 F.2d at 1094, 1095. It is not necessary to go over that ground again, nor to discuss in detail the facts and

---

9. There are curious errors in some of the findings; e. g., that Annapolis is located "at the approximate center of the Baltimore-Washington metropolitan corridor", when, in fact, none of the four roads from Baltimore to Washington passes within 15 miles of Annapolis; but those errors do not justify reversal of the Comptroller's decision.

**630**

conclusions set out in the Comptroller's opinion. It is sufficient to state that under the substantial evidence rule, and *a fortiori* under any less rigorous standard, the findings and conclusions of the Comptroller are adequately supported. His motion for summary judgment must be granted.

An appropriate judgment order will be entered.